

**FILED**

**APR 17 2013**

CLIFFORD J. PROUD
U.S. MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **APPLE IPHONE CELLULAR PHONE WITH PHONE NUMBER 314-262-2673 AND IMEI NUMBER 990002274985108** CURRENTLY LOCATED AT **DRUG ENFORCEMENT ADMINISTRATION FAIRVIEW HEIGHTS RESIDENT OFFICE, FAIRVIEW HEIGHTS, IL.** | Case No. 13-M-6012-CJP<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, **CHAD NORD,** being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 authorizing the search of the property, a cellular telephone with cellular telephone assigned number **(314) 262-2673** (the "**TARGET TELEPHONE**") and IMEI number **990002274985108**, whose service provider is *Apple, Inc.*, a telephone service provider and seller of telephones headquartered at Cupertino, California. The **TARGET TELEPHONE** is further described herein and in Attachment A, and the information to be seized is described herein and in Attachment B.

2. I am a **Task Force Officer** with the **Drug Enforcement Administration** and have been for approximately six months. Prior to being a Task Force Officer, I was a member of the St. Clair County Drug Tactical Unit for approximately nine months. I have been in law enforcement for approximately five years. I have participated in numerous narcotics investigations involving the manufacture, transportation, distribution, and sale of controlled substances, as well as the methods of laundering the proceeds of these illegal activities. During

the course of my law enforcement experience, I have participated in several complex investigations of drug-trafficking organizations dealing in cocaine, marijuana, heroin, methamphetamine and other controlled substances. I am familiar with and have used normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, search and arrest warrants, informants, pen registers, precision location information, confidential sources, and undercover agents. My specialized training has included, but is not limited to investigation of the manufacture, possession and distribution of controlled substance listed within the Controlled Substance Act, executing search and arrest warrants involving drug offenses, gathering drug and non-drug evidence, undercover assignments, and supervision and utilization of informants.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, Confidential Sources (referred to as CS's), and Sources of Information (referred to as SOI's). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii) have been committed by the user of the **TARGET TELEPHONE**, and other known and unknown persons.

## BACKGROUND OF INVESTIGATION

5.    On March 27, 2013, at approximately 5:30 p.m., agents from the Fairview Heights Resident Office (FHRO) learned that "ROYCE" was travelling from Chicago, IL to the Metropolitan St. Louis area. Agents eventually identified ROYCE as Royce SPANN and

learned that he was travelling from Chicago to St. Louis via Amtrak. Agents learned that the train was to arrive in St. Louis at approximately 10:13 p.m. after stopping in Alton, Illinois.

6. At approximately 10:45 p.m., agents from the FHRO established surveillance around the Amtrak Station at 430 South 15th Street, St. Louis, Missouri. SA Robert Eisenbarger, SA Jeremy Henning, SA Michael Rehg, and TFO Jose Cerna established a surveillance point inside the train station observing the off-loading passengers.

7. At approximately 11:05 p.m., SA Rehg, and SA Eisenbarger observed SPANN exiting the train station. SPANN was wearing a black jacket, carrying a black back and red shopping bag. SA Rehg, witnessed by SA Eisenbarger approached SPANN on the street in front of the train station. SA Rehg identified himself to SPANN as a DEA agent and asked to speak with him. SPANN acknowledged SA Rehg's request and spoke briefly to SA Rehg. SA Rehg asked SPANN to step onto the sidewalk out of the way of traffic so that they could talk. SPANN agreed and stepped onto the sidewalk. SA Rehg asked SPANN his name. SPANN told SA Rehg his last name was SPANN. SPANN also provided a first name, but SA Rehg could not understand his reply. At approximately the same time, SPANN quickly dropped his back-pack, shopping bag and coat and ran. SA Rehg, SA Eisenbarger and others gave chase as SPANN ran west on Poplar Street towards 18th Street. Before reaching 18th Street, SPANN leaped from the elevated section of Poplar Street to the parking lot below. SPANN jumped another fence and disappeared running south under I-64.

8. TFO Cerna and SA Jeremy Henning recovered the back-pack, shopping bag and coat discarded by SPANN at the time he was approached by agents. TFO Cerna, witnessed by SA Henning searched the back-pack and located a plastic bag containing suspected heroin. TFO Cerna also located various documents and medication bottle reflecting SPANN'S name, four (4)

cellular telephones, and two bundles of United States currency totaling $10,000 inside the backpack. These items will be maintained by agents. These items were immediately turned over to SA Rehg, witnessed by TFO Chad Nord.

9. The **TARGET TELEPHONE** is currently in the lawful possession of the **Drug Enforcement Administration (DEA).** It came into the **DEA's** possession when it was seized after Spann fled from agents in connection with an investigation into discovery of approximately 821 grams of suspected heroin in a backpack Spann dropped at the scene. Therefore, while the **DEA** might already have all necessary authority to examine the **TARGET TELEPHONE**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **TARGET TELEPHONE** will comply with the Fourth Amendment and other applicable laws.

*10.* The **TARGET TELEPHONE** is currently in storage at **DEA Fairview Heights RO, Fairview Heights, IL.** In my training and experience, I know that the **TARGET TELEPHONE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET TELEPHONE** first came into the possession of the **DEA**.

11. In my training and experience, I have learned that *Apple, Inc.* is a company that provides cellular telephones to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to unlock, examine and extract data stored on devices of this type.

### TECHNICAL TERMS

12. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

   This storage media can contain any digital data, including data unrelated to photographs or videos.

 c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

 d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

    to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

13. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

14. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

15. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET TELEPHONE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET TELEPHONE** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual

        information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

16. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET TELEPHONE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17. *Manner of execution.* Because this warrant seeks only permission to examine a **TARGET TELEPHONE** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

18. Based on my training and experience, it is my understanding that *Apple, Inc.* has the technical capability to unlock and examine the **TARGET TELEPHONE**. Additionally, it is my understanding that if *Apple, Inc.* cannot unlock the **TARGET TELEPHONE**, *Apple Inc.* has the technical capability to bypass unlocking the **TARGET TELEPHONE** and instead extract the data and information stored on the **TARGET TELEPHONE**.

## AUTHORIZATION REQUEST

19. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, authorizing the examination of the **TARGET TELEPHONE** described in Attachment A to seek the items described in Attachment B.

20. I further request, pursuant to 18 U.S.C. § 3103(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103(b)(1).

21. I further request that the Court direct *Apple, Inc.* to disclose to the government any information described in Attachment B that is within the possession, custody, or control of *Apple, Inc.* I also request that the Court direct *Apple, Inc.* to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with *Apple, Inc.'s* services. The government shall reasonably compensate *Apple, Inc.* for reasonable expenses incurred in furnishing such facilities or assistance.

22. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Chad Nord
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on April 17, 2013.

CLIFFORD J. PROUD
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS